## WILSON v DAYTON STREET TRANSIT CO.

Ohio Appeals, 2nd Dist, Montgomery Co.

No. 1580. Decided Jan. 22, 1940.

Froug & Froug, Dayton, for plaintiff-appellee.

Paul H. Blum, Dayton; McMahon, Corwin, Landis & Markham, Dayton, for defendant-appellant.

## OPINION

By BARNES, J.

The above entitled cause is now being determined as an error proceeding by reason of defendant's appeal from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

Plaintiff's action was one for personal injuries claimed to have been sustained on October 12, 1937, at about 2:30 P. M. when she fell from one of defendant's railless trolley cars, allegedly through the negligence of the operator causing sudden, unusual jerk, by which she was thrown backwards out of the rear door, falling on the concrete pavement, thereby sustaining serious and permanent injuries. The specific claimed acts of negligence set out in the petition were the following:

"Plaintiff further says that while she was standing in said bus, as hereinbefore set forth, the operator of said bus, an agent of the defendant corporation, while in the conduct of the defendant's business, started up said bus with great momentum and jerk, and which caused plaintiff to be thrown against the exit door of said bus, and that said exit door opened and she was thrown clear out of said bus.

Plaintiff further says that the injuries hereinafter complained of were caused solely and wholly through the carelessness and negligence of the operator of said street bus, an agent of the defendant corporation, in that said operator started said street bus with such momentum and force as to cause said street bus to make a sudden and unusual jerk, and cause plaintiff to lose her balance and be thrown against the exit door of said street bus, and further that the defendant was negligent and careless in the use and condition of said bus at the time and place hereinbefore set forth, and further that said bus on which plaintiff was a passenger was negligently and carelessly permitted to be in a dangerous condition, in that the exit door failed to operate properly and for some reason unknown to this plaintiff opened and allowed

her to fall out of said exit door and onto the street, while said bus was in motion."

The alleged injuries sustained by plaintiff as set out in her petition are as follows:

"Plaintiff further says that by reason of the aforesaid negligence and carelessness of the defendant, she suffered an injury to her entire back, injury to her entire spine and injuries to the back of her head; that she suffered a brain concussion and bruises and abrasions to her entire body; that she suffered a nervous shock to her entire nervous system; that she is unable to sleep and eat, and has lost weight.

"Plaintiff further says that prior to said accident she was a woman of good health, was able to earn a living doing housework, but that since said accident she is unable to do such work, and by reason of said condition she has lost wages and will continue to lose wage in the future; that she believes that said injuries are permanent, and that she suffered and will continue to suffer great pain and mental anguish as a result of said injuries; that she required medical attention, and that she will continue to require medical attention in the future, all to her damage and loss in the sum of $5,000, to which amount she asks judgment."

Defendant's answer admitted many of the allegations of the petition, but specifically denied any act of negligence and further averred that any injuries sustained by plaintiff were due solely to her own negligence.

The evidence as disclosed from the record presents the following historical facts:

On the morning of the day in question the plaintiff a colored woman about 40 years of age, in company with her little five year old nephew, went to a home in Dayton View as was her custom to do the weekly laundry work. Early in the afternoon she had finished her work, and thereafter walked to the corner of Richmond and Neil Avenue

where she boarded the bus, being trackless trolley, No. 125.

It was a front door entrance and rear door exit. When she and her little nephew got on the bus, it was crowded, many standing in the aisle, but she squeezed herself through to the rear, and within two or three squares after she entered the bus the accident happened. According to the testimony of plaintiff she had reached a grab post at the rear of the trolley and in proximity to a vacant seat when the trolley gave a sudden, unusual jerk, throwing her backwards and around toward the rear entrance, when the door suddenly opened and she fell out, landing on her back. It was plaintiff's contention that at the time she was thrown out the car was in motion, but immediately someone yelled to the operator that a passenger had fallen off, the trolley was stopped, and plaintiff was helped back onto the car. The evidence conclusively established that plaintiff fell off the car, but there is some divergence as to how she fell and other details.

Much evidence was presented touching specifications of the trolley and particularly the operations of the entrance and exit doors.

The trolley in question, No. 125, was one of a number owned and operated by the defendant company; it was what would be properly designated as a one-man car, and his seat was to the front and left, from which he drove the trolley in the same manner as an automobile would be driven.

The entrance door was controlled by a lever accessible to the driver, and the door was described as a folding accordion type, and not on hinges. The door split in the center and folded back each way. The rear exit door was electrically controlled and would not open except through certain coordinate acts as follows: In front of the exit door and on the step is what is designated a treadle, intended to be stood upon by a passenger desiring to leave the car; this treadle would not operate except when the front door was open, or in the alternative, when the front door was not open, the operator

of the car could, by pushing a button on the dash in front of him, so control the treadle that it would operate and perform its function of opening the door when a passenger stood thereon.

It was also the claim of the defendant company, supported by evidence, that following the opening of the rear exit door the motive power was disengaged, and the car could not be moved forwards until the rear door was closed.

Also a claim of defendants, supported by evidence, that due to automatic controls the car could not be started with a jerk. A rational inquiry arises as to how the accident could have happened, provided the mechanism of the trolley car was working properly. The jury returned a verdict in favor of the plaintiff in the sum of $3,000.00. Interrogatories were submitted and answered. Interrogatory No. 1, together with answer, was as follows:

"Q. Do you find the defendant was negligent?
A. Yes."

Second interrogatory:

"Q. If your answer is yes to the above question, state in what manner?
A. Due to unusual jerk of trolley bus and negligence on part of operator to close front door properly, plaintiff was thrown out of said bus, suffering injuries."

Motion for new trial was duly filed, overruled, and judgment entered on the verdict within due time. The cause was lodged in this court by duly filed notice of appeal on question of law. Under appellant's assignments of errors it sets forth nine separately numbered and stated specifications. The same form is followed as is usual in applications for new trial. The usual form of motion for new trial generally follows the statute; whereas, it is the office of assignment of errors to be more specific. This is one of the purposes of the new suggested forms of briefs as found in Ohio Bar under date of October 23, 1939.

In the interest of saving time and space, we will rearrange the order of the several assignments and also reclassify so that the discussion will proceed in chronological order. We will discuss and determine all the claimed errors, but not necessarily in the order set out under the assignments of errors. We first consider specification No. 4 in the assignment of error:

### "MISCONDUCT ON THE PART OF A JUROR"

The claimed misconduct is directed against juror, Tobias Neff, afterwards designated as foreman in the verdict of the jury.

Juror Neff was inquired of as were all other jurors, as to his occupation. His reply was that he was a millwright by trade. The next question and answer is as follows:

"Q. Are you working now?
A. No, I am not at present."

After the return of the verdict and before the jury was discharged, the Court permitted inquiry of this juror as to other claimed misconduct, and preliminary to this particular misconduct the following questions and answers are disclosed:

"Q. What is your business now?
A. Well, I am night watchman on WPA part of the time."

And later on the hearing on motion for new trial this juror was further interrogated and in answer to preliminary questions answered as follows:

"Q. Are you working?
A. On WPA."

It is conceded that this misstatement standing alone might not be sufficient upon which to predicate a claim of mistrial, but when taken in connection with other claimed misconduct is supporting. It was further claimed that on the last day of trial at a noon recess juror Neff, by wink, nod, and smile to one of the attorneys for plaintiff, mani-

fested an agreement with plaintiff's case. This claim is supported by affidavit by one of the attorneys for the defense and is corroborated by an affidavit of another attorney for the defendant that he observed the reddened and embarrassed countenance of the juror immediately following the claimed wink, nod and smile. Counter affidavits were filed denying the occurrence.

The trial court properly permitted very full investigation as to this claimed misconduct, not only by affidavits, but also oral testimony. That such conduct, if established, would be grounds for a new trial is obvious. It was the view of the trial court that counsel for defendant had misinterpreted the conduct of the juror and held against defendant's claim of misconduct.

The trial court, having determined this matter purely on a factual question and being in better position to review this situation, we would not feel warranted in determining that the trial court was in error in its finding.

This assignment of error will be overruled.

We next consider fifth assignment specifically set out as:

### "MISCONDUCT ON THE PART OF COUNSEL FOR PLAINTIFF-APPELLEE"

In one or two instances counsel for plaintiff when his client was being cross-examined answered the question ahead of the witness. Objection was interposed and sustained. This was, undoubtedly, improper, but we are unable to say it was of sufficient moment to be prejudicial.

A more serious question presents itself through the reply argument of counsel for plaintiff. Parts of the argument, while admittedly outside the record, yet it is the claim of counsel for plaintiff that it was in answer to some statements made by counsel for defendant in argument, it also being outside the record. Insofar as counsel

kept himself within the bounds of answering defendant's counsel, no serious question can arise. On these matters and others, counsel stretched his privilege to the limit. To say the least, it is a border line case. The trial court could very properly in some instance have admonished counsel without being requested so to do. With some misgivings we have concluded not to disturb the verdict on the ground of misconduct.

We might have omitted some of our observations, but we concluded to avail ourselves of the opportunity of making comment in the hope that it might have some salutary effect in future litigation.

Assignment of error No. 6 is as follows:

"COURT OF COMMON PLEAS ERRED IN OVERRULING THE MOTION TO DECLARE A MISTRIAL."

This claimed assignment is predicated primarily on the claimed misconduct on the part of juror Neff. Nothing further need be said at this time.

Assignment of error No. 1 reads as follows:

"COMMON PLEAS COURT ERRED IN OVERRULING THE DEFENDANT-APPELLANT'S MOTION FOR A DIRECTED VERDICT."

Counsel for defendant protected their record in making motion for directed verdict at the close of plaintiff's testimony and again at the close of all the testimony. This assignment is predicated upon the claim that there is an entire failure of proof showing any actionable negligence on the part of the defendant or, following the Hamden-Lodge case, the evidence and its inferences were not of such a character as would permit reasonable minds to differ.

We are unable to follow counsel's theory. It is true that plaintiff was the only witness testifying to a violent, unusual jerk, but it is our conclusion that the fact that the stopping or movement of the car, or both, so unbalanced the plaintiff as to pull her hand and arm loose from the standard to which she was holding, and then veered her around and backwards to the exit door where the same opened and permitted her to fall out, is a circumstance corroborative of plaintiff's claim of an unusual jerk. All witnesses, even those testifying for the defendant, say that plaintiff fell out the door. There is some difference in testimony of three school children called by defendant as to detail, but this is only such as is usual where any number of persons attempt to narrate what they have seen at the time of the occurrence being inquired about. One school boy, called as a witness by the defendant, who on the date of the accident was seated in the rear of the car gave his version of the accident as follows: That he observed the plaintiff coming to the rear of the car; that when she was close to the rear seats she placed her right arm around the standard; that when the car slowed down to stop, it naturally pulled her forward, and when it came to a full stop she then stumbled backwards and her arm around the standard acted as a pivot, moving backwards towards the rear exit door, and when she stepped on the treadle the door opened and she fell backwards out of the car. This witness and two others, all being school children and seated, testified that there was not an unusual jerk, but we must understand that their situation and position was different from plaintiff. In the first place, they were very young, and youngsters would not observe jerks as would older people. Furthermore, they were seated, and the effect even of an unusual jerk would not manifest itself to them. Whether or not the claimed unusual jerk was occasioned through the stopping of the car rather than of the starting would not constitute a variance between the pleadings and the evidence. As heretofore stated, it was the jury's determination that the operator of the trolley bus was negligent in not entirely closing the

front door before starting. Either the operation of the car in stopping or starting or a combination of both caused plaintiff to lose her hold on the standard and veer backwards to the exit door which opened on her stepping on the treadle would be supporting. In this case the circumstances of what actually happened as testified to by all witnesses would warrant an inference of improper operation.

In fact, it would be stronger than word of mouth testimony of any witness.

It is our judgment that the trial court committed no error in refusing to direct a verdict.

The seventh assignment of error is as follows:

"THE COMMON PLEAS COURT ERRED IN OVERRULING THE DEFENDANT-APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT."

This assignment raises the identical question as has been considered under assignment No. 1, and no further comment is necessary.

Second assignment of error. This assignment reads as follows:

"THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

What we have heretofore said relative to assignment No. 1 applies to assignment No. 2. It is our judgment that the evidence was adequate to the right of recovery of the plaintiff.

Third assignment is as follows:

"THE VERDICT IS EXCESSIVE."

That plaintiff in falling from the car onto the concrete pavement would be injured is to be expected. At the time she manifested very little evidence of serious injury. The motorman testified that in answer to his questions she stated she was not hurt. This testimony was corroborated by others, passengers on the car. After the accident she got onto the car and was given a seat. After moving forward a couple squares, the car was out of commission with a broken axle. There is no evidence that the broken axle had any connection or could have affected the operation of the doors or been in any way responsible for the accident to the plaintiff.

At this point the passengers, including the plaintiff, were transferred to another bus, and all proceeded then to the downtown section, where plaintiff transferred to another car and went to her home some distance away. Plaintiff's injuries were not known to her to be serious until later, but this is not surprising. It is a matter of common knowledge that people seriously injured frequently don't realize it until sometime afterwards. Early in the evening she called her family Doctor and he ordered her to bed where she remained for some four or five weeks. He diagnosed the trouble as a slight concussion and severe sprain in the ligaments of the back. This family physician testified that he had treated her continuously off and on for over a year and that she had not fully recovered from the effects of her injury at the time of the trial. He further testified that in his judgment her injuries were permanent. Plaintiff testified that she had not been able to work more than a half a day a week at any time since her injury, whereas prior to her injury she had worked five days a week and made ten to fifteen dollars a week in wages.

The defendant called as a witness Dr. Kuhl who made his examination of the plaintiff shortly before the trial. He found no objective symptoms. In fact this was also the testimony of plaintiff's physician; that is, that all objective symptoms had disappeared.

This again is not unusual, but where physicians have nothing to go upon except subjective symptoms a query might arise in any case as to whether or not the claimed pain is real or imaginary. The jury saw the plaintiff, heard the testimony of all witnesses

74

relative to the nature and extent of the claimed injuries. They were in better position than could be a reviewing court to determine the credibility. This would also apply to the trial court.

Under the situation here presented if the trial court considered the amount of the verdict justified we would not feel warranted in molesting it.

The eighth assignment of error reads as follows:

"COMMON PLEAS COURT ERRED IN OVERRULING THE DEFENDANT-APPELLANT'S MOTION FOR NEW TRIAL."

Of course, this assignment does no more than to call attention to claimed errors heretofore passed upon.

Nothing more need be said at this time.

Ninth assignment of error reads as follows:

"AND FOR ALL OTHER ERRORS APPARENT ON THE RECORD AND PREJUDICIAL TO THE RIGHTS OF THE DEFENDANT-APPELLANT."

This assignment is the usual omnibus all inclusive claim made under motion for new trial, but really has no place under assignments of error.

At least we find none other discussed.

Finding no prejudicial error, the judgment of the trial court will be affirmed and costs adjudged against appellant.

HORNBECK, PJ. & GEIGER, J., concur.